# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 18-1017V
Filed: May 24, 2023
PUBLISHED

| | |
|---|---|
| STACY RATZLAFF,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Special Master Horner<br><br>Tetanus Diphtheria acellular<br>Pertussis (Tdap) Vaccine; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA); Damages |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*
*Rachelle Bishop, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON DAMAGES[1]

On July 16, 2018, Stacy Ratzlaff filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.* (the "Vaccine Act"). Petitioner alleges that she suffered a Shoulder Injury Related to Vaccine Administration ("SIRVA"), resulting from adverse effects of a Tetanus-Diphtheria-Pertussis ("Tdap") vaccination she received on November 15, 2016. Petition at 1. For the reasons discussed below, I now conclude petitioner is entitled to an award of $190,000.00 in compensation for actual pain and suffering, $3,799.75 for past unreimbursable expenses, and $800 per year for 35 years in compensation for projected pain and suffering. The parties are directed to file a joint status report in 30 days advising as to the net present value of the award for projected pain and suffering. Thereafter, I will issue a decision awarding these damages.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

I. **Procedural History**

As noted above this case was initially filed on July 16, 2018.  It was assigned to the Special Processing Unit.  (ECF Nos. 1, 5.)  Petitioner filed her Statement of Completion on October 1, 2018. (ECF No. 14.)  Respondent filed a Rule 4(c) Report recommending against compensation on August 21, 2019. (ECF No. 24.)  Respondent raised, *inter alia*, the question of whether onset of petitioner's shoulder pain occurred within 48 hours of her vaccination as alleged. (*Id.*)

The case was subsequently reassigned to me on May 1, 2020. (ECF No. 36.)  On March 10, 2022, I issued a finding of fact concluding that petitioner suffered onset of shoulder pain within 48 hours of her vaccination.  (ECF No. 57; *see also Ratzlaff v. Sec'y of Health & Human Servs*., No. 18-1017V, 2022 WL 1000889, at *1 (Fed. Cl. Spec. Mstr. Mar. 10, 2022).)

Thereafter, respondent filed an amended Rule 4 indicating that he would not continue to defend the case on other grounds.  Respondent reserved the right to appeal the finding of fact, but otherwise agreed the requirements for a Table SIRVA were met. (ECF No. 60.)  Accordingly, a ruling on entitlement was issued on May 13, 2022, finding petitioner entitled to compensation for a Table Injury of SIRVA. (ECF No. 61; *see also Ratzlaff v. Sec'y of Health & Human Servs*., No. 18-1017V, 2022 WL 2046080 (Fed. Cl. Spec. Mstr. May 13, 2022).)

The parties were unable to resolve damages informally and the parties were ordered to file briefs.  Petitioner filed her initial brief on damages on January 3, 2023. (ECF No. 73.)  Respondent filed his response on February 17, 2023. (ECF No. 74.)  Petitioner filed a reply on April 3, 2023. (ECF No. 77.)  Accordingly, this case is now ripe for a decision awarding damages.

II. **Factual History**[2]

Petitioner was 44 years old at the time she received the Tdap vaccination that caused her SIRVA on November 15, 2016. (Ex. 1, p. 1.)  Respondent stresses she had a prior history of left shoulder pain. (ECF No. 74, p. 3 (citing Ex. 16, p. 1; Ex. 2; Ex. 14, p 29; Ex. 17, p. 68).)  However, the prior finding of fact noted that she had no left shoulder complaints by the time of the vaccination at issue. (ECF No. 57, p. 2 (citing Ex. 14, p. 29; Ex. 4, pp. 16-19).)

---

[2] In addition to the medical records filed in this case, petitioner filed four statements. (Exs. 11, 19, 22, and 34).  The first is a signed and notarized affidavit indicating it is sworn under penalty of perjury. (Ex. 11.)  The second statement is styled as an affidavit and states that it is declared under penalty of perjury, but is not notarized (it is merely electronically signed with a "/s/" signature).  (Ex. 19.)  The third statement has no heading and does not purport to be sworn. (Ex. 22.)  The fourth statement is styled as an affidavit and indicates it is sworn under penalty of perjury.  It has an electronically confirmed, but not notarized, signature. (Ex. 34.)  Petitioner has also filed six witness statements. (Ex. 23 (Trevor Ratzlaff); Ex. 24 (Chloe Johnson); Ex. 25 (Jacie Benson); Ex. 26 (Kelsey Nelson); Ex. 27 (Gary Simon); and Ex. 28 (Laura Bownds).)  None of the witness statements are sworn.

Eight days later petitioner presented to Advanced Physical Therapy for an initial evaluation. (Ex. 2, p. 48.)  At that time she reported "severe" pain that was continuing to increase and spread. (*Id*.) She had "pain with any movement" and was "unable to use [her] arm with any [activities of daily living]." (*Id*.)  The physical therapist recorded a 50% disability based on objective measures, including pain and reduced passive range of motion on exam. (*Id*.)  Thereafter petitioner completed eight physical therapy sessions between November 23 and December 20, 2016. (Ex. 2, pp. 48-70.)

On December 14, 2016, petitioner presented to her primary care physician. (Ex. 4, p. 11.)  On physical examination she had tenderness of the glenohumeral joint and decreased range of motion.  She was diagnosed with bursitis and administered an injection of Marcaine and Kenalog. (*Id*. at 13-14.)  Following these injections, she reported no pain at the time of her physical therapy discharge on December 20, 2016. (Ex. 2, p. 51.)

Petitioner avers that she got "some relief" from the injection, but indicates that the pain came back. (Ex. 11, p. 1.)  A specific timeframe is not indicated. (*Id*.)  Petitioner would later report to her physician that relief from the steroid injections lasted only about a week or two (Ex. 5, p. 105); however, respondent stresses that petitioner's contemporaneous records document that she did not report shoulder pain to any physician again for approximately **11 months** despite seeking care for other conditions in the interim (ECF No. 74, p. 4 (citing Ex. 4, pp. 3-10; Ex. 3, pp. 9-12, 16-19, 24-28).)  Petitioner contends, however, that her pain did persist during this period. (ECF No. 73, p. 4.)  Petitioner avers that during this period she was concentrating on other conditions and significant life events.[3] (Ex. 11, p. 1.)

Petitioner established care with a new primary care physician, Dr. Dunlavy, on June 26, 2017, but did not reraise any concern regarding her shoulder until returning for a well woman exam on November 17, 2017.  (Ex. 3, pp. 9, 5.)  At that time petitioner provided a history of having had pain ever since her vaccination.  (Ex. 3, p. 5.)  In her affidavit, she indicates she sought care at this time because her life had "slowed down." (Ex. 11, p. 1.)  She reported to Dr. Dunlevy that she was experiencing sharp pain that was worsening, aggravated by movement, and interfering with sleep.  She also had weakness; however, no musculoskeletal physical exam was recorded.[4]  (Ex. 3, pp. 5-8.)  She was referred to an orthopedist. (*Id*. at 8.)

On December 5, 2017, petitioner presented to an orthopedist, Dr. Livermore. (Ex. 5, p. 105.)  She reported pain that had worsened subsequent to her steroid injections

---

[3] Specifically: her daughter had surgery, she experienced severe pain traveling for another daughter's destination wedding, her mother passed away and there was an out-of-town funeral, her son graduated and left for the army, her father had surgery, she had an endoscopy and colonoscopy, she started a new medication, Mercaptopurine, for her Crohn's disease with significant side effects.  (Ex. 22.)

[4] Respondent stresses that petitioner had a normal musculoskeletal exam with Dr. Dunlavy on June 26, 2017. (ECF No. 74, p. 4 (citing Ex. 3, pp. 9-12).)  However, that exam is limited to noting that "Joints, Bones, and Muscles: normal movement of all extremities. Extremities: no edema." (Ex. 3 at 11.)

and that she felt she "has lost some [range of motion]." (*Id*.)  She characterized her pain as "moderate, severe (sometimes)."  She indicated the pain is intermittent, occurring with movement, and aggravated by pulling, lifting, throwing, etc.  (*Id*.)  In addition to her prior physical therapy and steroid injections, she reported treating with rest, ice, heat, over the counter pain medication, and a home exercise plan. (*Id*. at 105-06.)  On physical exam, petitioner had tenderness to palpation at the acromion process, subacromial space, supraspinatus, and infraspinatus. (*Id*. at 108.)  She had limited forward flexion, abduction, and external rotation, as well as reduced supraspinatus strength.  Hawkin's test was positive. (*Id*.)  An MRI was ordered.  Petitioner's subsequent December 7, 2017, MRI showed supraspinatus tendinopathy without a tear, labral fraying, and bursal fluid. (Ex. 5, p. 67.)  Petitioner felt she had pursued conservative treatment long enough and opted for a diagnostic shoulder arthroscopic surgery. (*Id*. at 70.)

Petitioner underwent shoulder surgery on December 29, 2017. (Ex. 6, p. 1.)  During the procedure, "marked bursitis" was encountered in the subacromial space and a bursectomy was performed.  A partial thickness tearing of the supraspinatus was also observed and the tendon tissue was debrided.  Petitioner also underwent an acromioplasty. (*Id*. at 2.)  Following the procedure, petitioner reported on January 9, 2018, that she was feeling better. (Ex. 5, p. 30.)  Petitioner underwent physical therapy from January 2, 2018, to February 22, 2018.  (Ex. 2, pp. 73-90; Ex. 7, pp. 2-24.)  These records reflect a good period of recovery, but not necessarily a total recovery.  By the time of her last physical therapy sessions, she was demonstrating good range of motion with progressing strength and planned to continue a home exercise plan. (Ex. 7, p. 23.)  Petitioner had met 90-95% of her longer-term goals of reducing her pain and disability. (*Id*. at 24.)  About a month later, petitioner presented to her orthopedist's office on March 27, 2018, with "some" residual pain. She received another steroid injection. (Ex. 5, p. 123.)  Petitioner avers she experienced no relief from this injection. (Ex. 11, p. 2.)

Both petitioner and her daughter discuss the fact that petitioner had a grandson born in March of 2018 and express frustration at her inability to be as involved as she would like due to her shoulder condition. (Ex. 22, p. 3; Ex. 25, p. 2.)

On May 25, 2018, petitioner presented to a new orthopedist, Dr. Strickland. (Ex. 9, p. 2.)  She rated her pain as a 7/10 and indicated it is constant and aggravated by lifting and other activities. (*Id*.)  Petitioner had reduced range of motion and positive Hawkin's test as well as a positive cross-body abduction test and crepitus. (*Id*. at 3.)  Dr. Strickland did not find any abnormalities on x-ray or MRI apart from fluid around the rotator cuff. (*Id*. at 4.)  Petitioner opted for a second arthroscopic surgery in lieu of pursuing further conservative treatment options. (*Id*.)  During that surgery, residual joint inflammation was observed and a complete bursectomy was performed along with a partial acromionectomy and distal clavicle excision. (Ex. 10, p. 2.)  Petitioner then pursued physical therapy from June 25, 2018, to August 3, 2018, initially reporting pain ranging from 2/10 to 5/10, but noting pain of 0/10 and a 90% improvement in her range of motion at discharge. (Ex. 12, pp. 1-26.)  Thereafter, respondent notes there is a **16-month** gap in her treatment history. (ECF No. 74, p. 6.)  In a statement filed July 13,

2020, petitioner confirmed her second surgery and subsequent physical therapy "took care of the extreme pain but I noticed on cold days or when I didn't feel good, etc my shoulder would ache." (Ex. 22, p. 2.)

On December 23, 2019, petitioner returned to orthopedic care.  (Ex. 21, pp. 3-4.)  At that time she reported a one year history of throbbing and aching pain, rated as moderate at 5/10, that would "come and go" and made worse with lifting and reaching overhead. (*Id*. at 3.)  She reported that she was continuing home exercises. (*Id*.)  On physical exam she had full active range of motion, full strength, and only mild tenderness over the subacromial bursa.  Impingement testing was negative. (*Id*. at 4.)  She opted for a steroid injection, her third. (*Id*.)  She returned on February 3, 2020, for a follow up. (Ex. 21, pp 8-9.)  She was reportedly 70% improved and with pain rated at 2/10. (*Id*. at 8.)  At this visit, however, physical exam indicated new tenderness over the posterolateral corner of the acromion and positive signs of impingement. (*Id*. at 9.)  It was noted that the prior steroid injection had provided only temporary relief. (*Id*.)  A further injection and an MRI study were recommended, and petitioner was to follow up in six weeks; however, as respondent observes, there is then a **13-month** gap in petitioner's treatment history. (ECF No. 74, p. 7.)  In her July 2020 statement, petitioner indicates that she continued to experience "occasional" achiness after her December 2019 steroid injection for which she was relying on Motrin and a prescription ointment. (Ex. 22, p. 2.)

On March 19, 2021, petitioner returned to orthopedic care reporting that her symptoms had worsened "recently."[5] (Ex. 29, p. 1.)  She rated her pain at 8/10 and indicated she had no new symptoms. Her pain was waking her at night and she was unable to do any overhead lifting. (*Id*.)  Physical examination indicated reduced range of motion, reduced strength, and positive impingement, Hawkin's sign, Neer's sign, and Jobe's sign. (*Id*. at 2.)  An MRI was ordered. (*Id*.)  That MRI showed increased fluid in the subacromial and subcoracoid bursa, edema within the AC joint (possibly degenerative, but with separation not ruled out), and mild chondromalacia in the glenohumeral joint. (*Id*. at 4.)  On further follow up, petitioner noted as of March 31, 2021, that she had experienced improvement but still reported moderate pain of 4/10. (*Id*. at 7.)  Primary osteoarthritis was added to her diagnosis in addition to bursitis. (*Id*. at 9.)  Surgery was recommended as a "worse case," but petitioner opted to proceed with surgery. (*Id*.)

On April 15, 2021, petitioner underwent her third shoulder surgery. (Ex. 30.)  Petitioner had "some residual bursitis and scar tissue in the subacromial space" and a complete bursectomy was performed. (*Id*. at 2.)  She also had a revision to her prior distal clavicle excision. (*Id*.)  She attended physical therapy from April 20, 2021, to June 15, 2021.  (Ex. 31.)  By the time of her physical therapy discharge she was "feeling great" and reported pain of 0/10, 2/10 at worst. (*Id*. at 33.)  She reported no difficulties with activities of daily living.  (*Id*.)  Petitioner contends "these gains would not be long-

---

[5] In a subsequent physical therapy record, petitioner would reportedly characterize this time frame as being six weeks prior to April 20, 2021, which would be about the first week of February. (Ex. 30, p. 1.)

lasting." (ECF No. 73, p. 7.)  However, respondent stresses that there is a **one-year** gap in petitioner's treatment history following this physical therapy discharge. (ECF No. 74, p. 8.)

On August 9, 2022, petitioner presented to physical therapist Jerry Pomeroy. (Ex. 32.)  Petitioner reported that her third surgery had provided relief, but she still had difficulty sleeping in some positions.  She reported only being able to work overhead for a few seconds and that she was experiencing pains and popping that had begun to increase. (*Id*.)  She reported her current pain as 2/10, but 8/10 at worst. (*Id*.)  She was assessed as having a total disability index of 56%. (*Id*.)  Mr. Pomeroy provided a letter dated October 4, 2022.  He wrote that "[i]t is my professional opinion that her pain is permanent and will never truly go away . . . She will need to do physical therapy 'maintenance' for her shoulder the rest of her life to keep the pain and inflammation minimal and hopefully 'tolerable.'"  (Ex. 33.)  Importantly, however, Mr. Pomeroy's August 9, 2022 medical record indicates that petitioner's condition is "unstable" and "unpredictable," but with a "good" potential for rehab. (Ex. 32, p. 2.)

There is no evidence of record to indicate that petitioner returned to Mr. Pomeroy after August of 2022 as no further records were filed.  However, Mr. Pomeroy's letter of October 2022 letter confirms she had not returned in the interim. (Ex. 33.)  Respondent indicates this confirms a further **six-month** gap in her treatment history. (ECF No. 74, p. 17.)  However, in her October 27, 2022 affidavit, petitioner indicates she was unable to pursue her physical therapy because she suffered a "C-Diff/Crohn's fla[re]" related to an antibiotic she was taking for a sinus infection. (Ex. 34, p. 1.)  Petitioner suggests that the stress associated with her three shoulder surgeries "affected my health and had my body down."  (*Id*.)  She indicates that she has Sheehan's Syndrome, which prevents her from producing Cortisol and as a result she has difficulty with stress. (Ex. 11, p. 2; Ex. 22, pp. 2-3.)

### III.     Party Contentions

Petitioner requests $220,000.00 in compensation for past pain and suffering and $1,000.00 per year in compensation for future pain and suffering for the remainder of her life expectancy, 35 years.  (ECF No. 73, pp. 9, 15.)  Overall, petitioner argues her request is supported by the course of her condition, stressing that she has suffered her condition for more than six years, continues to have substantial pain and discomfort, has had three corrective surgeries with only limited relief, and all conservative measures have failed. (*Id*. at 11.)  Respondent contends petitioner should receive an award for pain and suffering of no more than $172,500.00. (ECF No. 74, p. 2.)  Respondent contends that petitioner's pain and functional deficits are best characterized as only "mild to moderate" and that she had several protracted gaps in her treatment history. (*Id*. at 14-20.)  Respondent also contends that petitioner has placed too much emphasis on the number of surgeries involved in this case.  (*Id*. at 22-23.)  Respondent contends petitioner has not made a showing sufficient to warrant an award of future pain and suffering. (*Id*. at 27-30.)  The parties agree that petitioner should be awarded $3,799.75 for unreimbursable expenses. (ECF Nos. 74, pp. 2-3; ECF No. 77, p. 1.)

Petitioner acknowledges that her requested award would be the highest pain and suffering award ever for a SIRVA case. (*Id*.)  However, she does stress that the statutory cap on pain and suffering awards should not result in a "sliding scale," with the maximum reserved for certain types of very severe injuries.  (EDF No. 73, p. 9 (citing *Graves v. Sec'y of Health & Human Servs.*, 109 Fed Cl. 579 (2013)).)  She compares her case to several prior reasoned decisions by special masters awarding damages in cases that involved multiple shoulder surgeries, specifically:  *Schoonover v. Sec'y of Health & Human Servs.*, No. 13-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering and $1,200.00 per year for future pain and suffering); *Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560 (Fed Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 in past pain and suffering); *Elmakky v. Sec'y of Health & Human Servs.*, No. 17-2032V, 2021 WL 6285619 (Fed. Cl. Spec. Mstr. Dec. 3, 2021) (awarding $205,000.00).  (*Id.* at 15-16.)

Respondent urges that the *Graves* decision cited by petitioner is not binding. (ECF No. 74, p. 10, n. 2.)  Instead, respondent urges that "special masters have awarded comparatively less severely injured petitioners comparatively less in pain and suffering."  (*Id.* at 9.)  Respondent stresses two cases predating the *Graves* decision that suggest the idea, specifically rejected by *Graves*, of a "continuum" of injury falling below the statutory maximum.  (*Id.* (citing *Stotts v. Sec'y of Health & Human Servs.*, No. 89-108V, 1990 WL 293856, at *16 (Cl. Ct. Spec. Mstr. Oct. 11, 1990*), rev'd on other grounds*, 23 Cl. Ct. 352 (1991); *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL 914914, at *5 (Fed Cl. Spec. Mstr. Feb. 28, 2007)).)  Respondent distinguishes the three prior decisions cited by petitioner (*Schoonover*, *Elmakky*, and *Lawson*) and argues that a fourth cases (*Pruitt*) in which the petitioner was awarded only $185,000.00 in past pain and suffering is more analogous to the present case. (*Id*. at 20-27 (citing *Pruitt v. Sec'y of Health & Human Servs*., No. 17-757V, 2021 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021).)

Additionally, respondent argues the following:

Respondent notes that comparisons to reasoned SIRVA damages decisions are becoming less and less helpful in resolving SIRVA cases for several reasons: first, the reasoned damages decisions in SIRVA cases constitute only a small fraction of the SIRVA cases adjudicated in the Vaccine Program, as hundreds of cases have been proffered at their full value since SIRVA was added to the Vaccine Injury Table; these proffers may be more useful for identifying comparable awards. *See Kent v. Sec'y of Health & Human Servs*., No. 17-0073V, 2019 WL 5579493, at *1 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (noting that as of July 1, 2019, 706 SIRVA cases had been resolved via the government's full-value proffers, and 462 more cases were resolved via litigative-risk stipulations). Second, and perhaps more importantly, the often-used method of choosing the midpoint of the parties' competing positions to resolve damages has resulted in inflated awards; when conceding a case, respondent must offer his full-

7

value assessment of damages, while petitioners have no such limitations, and any resulting meet-in-the-middle award is thus inflated. However, respondent also avers that reasoned decisions can be instructive when determining the severity of a case.

(*Id*. at n. 3.)

In reply, petitioner revisits the facts of the case in support of her view of severity and distinguishes the *Pruitt* case cited by respondent. (ECF No. 77, pp. 2-11.) Petitioner argues that proffers, "in effect, a 'short form' of settlement" are less helpful in resolving damages and contends that respondent's argument is contrary to Program law and the legislative history of the Vaccine Act. (*Id*. at 11-13.) Petitioner stresses my prior decision in *Lang v. Sec'y of Health & Human Servs*., No. 17-995V, 2022 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2022), in which I noted that "cases involving multiple surgeries are distinguishable as representing a group of more seriously injured petitioners." (*Id*. at 13-14.)

## IV.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 300aa-15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 300aa-15(a)(1)(B). Finally, petitioners who have had their earning capacity adversely impacted due to their vaccine injury may receive "compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections." § 300aa-15(a)(3)(A). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr.  Apr. 19, 2013)* (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, while potentially persuasive, decisions regarding prior awards are not binding. *See Nance v. Sec'y of Health & Human* Servs., No. 06–730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand.").

## V. Analysis

### a. The value of reasoned decisions versus awards based on proffer

Respondent agrees that "reasoned decisions can be instructive when determining the severity of a case" (ECF No. 74, n .10), but also seems to imply that awards by reasoned decisions and proffered awards have diverged, leaving reasoned decisions less persuasive. Specifically, respondent argues that prior reasoned decisions by special masters are inflating awards by merely "choosing the midpoint." (*Id.*) This is unpersuasive.

Out of the four cases cited by the parties in this case (*Schoonover*, *Lawson*, *Elmakky*, and *Pruitt*), only one case (*Schoonover*) awarded damages falling at the actual midpoint of the parties' positions. In fact, in *Lawson*, the special master noted that respondent did not even propose any amount and instead deferred to the special master's discretion. When the parties in prior SIRVA cases have been unable to resolve damages by agreement, very often the culprit has been differing views regarding the significance of various nuances in the overall clinical picture rather than any discrete issue in which one party is a clear winner and the other a clear loser. Therefore, the fact that the ultimate outcome in these disputed cases typically falls *somewhere* in between the positions staked out by the parties is not surprising.

As I previously observed in *Lang*, "[g]iven that SIRVAs can and often do resolve without any surgery at all, it is clear that those cases involving multiple surgeries are distinguishable as representing a group of more seriously injured petitioners." 2022 WL 3681275, at *9. Regardless of the sheer number of prior proffered SIRVA awards, cases like the instant case clearly represent outliers for which the overall statistics are not as helpful. As of January 1, 2023, the median proffered award for a SIRVA was $85,000.00, with first and third quartiles ranging from $65,000.00 to $112,654.00. *Henderson v. Sec'y of Health & Human Servs.*, No. 20-1261V, 2023 WL 2728778, at *3 (Fed. Cl. Spec. Mstr. Mar. 31, 2023). In contrast, the reasoned decisions cited by the

parties saw pain and suffering awards ranging from $185,000.00 to $205,000.00. Even respondent's own proposed award of $172,500.00 far exceeds the interquartile range of proffered awards. Neither party has cited any specific proffered award as analogous to the facts of this case.

### b. Analysis under the facts of this case

I am mindful of prior decisions regarding damages for SIRVA, including those cited by the parties. However, I do not merely rely on any prior decision to determine the amount of petitioner's damages in this case. Instead, I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record. The primary considerations informing pain and suffering in SIRVA cases is the severity and duration of the shoulder pain. Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of petitioner's reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of physical therapy, the modalities of treatment (*e.g.* steroid injections, surgeries, etc.), the severity of MRI or surgical findings, subjective reports of pain levels, and the ultimate prognosis.

In this case, although respondent stresses five substantial gaps in petitioner's treatment history, he does so only to draw attention to the severity (or lack thereof) of petitioner's ongoing symptoms. (ECF No. 74, pp. 16-18.) He does not specifically dispute that this case involves a full six years of sequela as petitioner alleges. (*Id*. at 27.) Nor does he dispute that any of the above-discussed treatment, up to and including petitioner's third surgery, were related to her vaccine injury. Thus, this is undisputedly a SIRVA case involving a protracted period of pain and suffering as well as a history of three separate surgeries. I agree with respondent that the number of surgeries alone is not a metric that instructs any specific dollar amount in preference to a holistic review of the petitioner's medical history. (ECF No. 74, p. 22.) Nonetheless, as petitioner observes in reply, it is also the case that surgeries are in themselves bodily traumas with recovery periods that contribute to pain and suffering. (ECF No. 77, p. 13 (quoting *Lang*, 2022 WL 3681275, at *9).) All of this would suggest a higher award, consistent with the other outlier cases cited by the parties.

However, despite the overall length of time that petitioner has suffered her condition, and despite her multiple surgeries over those years, respondent is persuasive in stressing that her numerous substantial gaps in treatment reflect that her condition was not consistently severe throughout that period as she contends. While petitioner has provided some evidence to suggest that extenuating circumstances help to explain the gaps in treatment, most notably with respect to her first gap in treatment, respondent is correct that the medical records demonstrate that the gaps in treatment corresponded to periods of significant recovery. Thus, even concluding that this case is properly situated among other outlier cases involving higher awards due to multiple surgeries and prolonged recovery periods, this case stands out among those cases as warranting a comparatively lower award.

10

i.  Actual pain and suffering

Petitioner's first gap in treatment lasted for 11 months following her first physical therapy discharge on December 20, 2016.  Petitioner attributes this gap primarily to the fact that she was attending to other concerns in her life during this period.  However, the physical therapy discharge indicates that she reported no pain at the time this gap in treatment began, albeit immediately following a steroid injection. (Ex. 2, p. 51.)  Petitioner established care with a new physician (Dr. Dunlevy) during this period without mentioning her shoulder pain. (Ex. 3, p .9.)  Although petitioner reasonably suggests that life events can keep a patient away from care, these considerations do not explain why petitioner would not report bothersome symptoms when already taking the time to present to medical attention, especially when establishing care with a new general practitioner.  When petitioner did later report her shoulder symptoms to Dr. Dunlevy in November of 2017, she reported as of that time that her symptoms were worsening. (Ex. 3, p. 7.)  Shortly thereafter, she explained to Dr. Livermore (her orthopedist) that her prior symptoms had been intermittent. (Ex. 5, p. 105.)

Petitioner's second gap in treatment lasted 16 months and followed her discharge from post-surgical physical therapy on August 3, 2018, following her second surgery. At that time, she reported pain of 0/10 and a 90% improvement in her range of motion. (Ex. 12, p. 1.)  She noted she only had pain "here and there" with reaching and lifting. (*Id.*)  Her statement filed in this case also confirms that during this period she was experiencing only residual achiness on some days – namely in the cold and when otherwise not well. (Ex. 22, p. 2.)  When she later returned to care, she reported that she had been experiencing pain that would "come and go." (Ex. 21, p. 3.)

Petitioner's third gap in treatment lasted for 13 months.  Shortly before this gap in treatment, petitioner confirmed pain of 2/10. (Ex. 21, pp. 8-9.)  Additional follow up was recommended, but petitioner did not pursue it.  (Ex. 21, p. 9.)  She opted instead to treat with Motrin and topical ointment during this period. (Ex. 22, p. 2.)  In her statement, petitioner indicates she was experiencing "occasional achiness" during this period. (*Id*.)  When she later returned for care, she confirmed that her pain had only "recently" worsened. (Ex. 29, p. 1.)

Petitioner's fourth gap in treatment lasted for one year.  It occurred after she was discharged from physical therapy on June 15, 2021, following her third surgery.  (Ex. 30, p. 33.)  At that time she reported "feeling great" and rated her pain at between 0/10 and 2/10.  (*Id*.)  When petitioner returned to her physical therapist on August 9, 2022 for an isolated follow up, she reported that her third surgery had provided "some relief," but that her pains "have begun to increase since [the] last surgery."  (Ex. 32, p. 1.)  Respondent's reference to a fifth gap in treatment refers to the fact that the record contains no evidence that petitioner ever followed up further after this August 9, 2022 physical therapy appointment.

While petitioner's treatment-seeking behavior may have been affected by a number of factors, the evidence supports the conclusion that the relative severity of her

11

pain and disability was an overriding consideration that likely explains her overall pattern of treatment. That is, all of the above demonstrates a pattern wherein petitioner stopped seeking treatment at times when her symptoms improved and then returned to seeking care when she felt they had worsened. Thus, without suggesting petitioner's condition ever *fully* resolved, it is very clear from the medical treatment records that petitioner's gaps in treatment corresponded to periods of substantial recovery. Therefore, the evidence indicates that petitioner underwent three surgeries over the course of six years and endured pain and suffering best described as including a total of approximately 15 months of moderate to severe symptoms and about 57 months of only intermittent to mild symptoms.[6]

> ii. <u>Projected pain and suffering</u>

Respondent disputes that petitioner has proven her SIRVA injury is permanent. He acknowledges that petitioner's most recent physical therapy evaluation by PT Pomeroy of August 9, 2022 demonstrates ongoing disability, but stresses that it gives no indication of permanence. (ECF No. 74, p. 28 (discussing Ex. 32).) Moreover, he stresses that the record indicates petitioner has "good" rehabilitation potential. (*Id.*) In contrast, PT Pomeroy provided a letter confirming that petitioner's disability is permanent. (Ex. 33.) However, respondent argues this letter is of "diminished probative value." (ECF No. 74, p. 29.) Specifically, respondent notes that the basis for the opinion is not stated, the letter was prepared for purposes of litigation, and the conclusion that petitioner's condition is permanent is inconsistent with PT Pomeroy's August 9, 2022 medical record. (*Id.* at 29-30.) Finally, respondent argues that the lack of any subsequent treatment records suggests petitioner's condition is not permanent. (*Id.* at 30.)

Importantly, despite the above, respondent does not dispute that the August 9, 2022 physical therapy record, which documents a 56% disability as of that time, does evidence sequela of petitioner's SIRVA. (ECF No. 74, p. 27 (acknowledging symptoms persistent for six years), p. 28 (citing the August 9, 2022 record as the "last treatment record submitted").) Moreover, respondent overstates the degree to which PT Pomeroy's letter and medical record are in tension. While it is true that the medical record indicates petitioner has "good" rehabilitation potential, nothing in the record suggests a "good" rehabilitation potential confirms a complete recovery. In fact, the record also caveats that her condition remains "unstable" and "unpredictable." (Ex. 32, p. 2.) Nor does PT Pomeroy's subsequent letter equate permanence with an absence

---

[6] Petitioner argues that she "had to endure the physical and emotional pain of her non-SIRVA medical conditions while at the same time suffering from severe shoulder pain clearly increased the physical and emotional distress petitioner suffered as a result of her injury." (ECF No. 73, p. 17.) She notes that "[i]t is a fundamental principle of tort law that respondent must take his petitioner as he finds him or her." (*Id.*) Respondent did not provide any direct response to this argument. (ECF No. 74.) I note that I do give credence to the suggestion that petitioner's other chronic conditions have made it more difficult for her to cope with her SIRVA and thereby may have been a contributor to her overall pain and suffering during those months when she was experiencing moderate to severe effects of her SIRVA. This has been accounted for in determining the final award.

12

of improvement. He specifically indicates that petitioner has the potential to reduce her symptoms to something "tolerable" with additional therapy. (Ex. 33.) Petitioner does suggest that extenuating circumstances have kept her from pursuing additional physical therapy subsequent to her August 9, 2022 encounter, but in any event her diligence in pursuing the recommended therapy to improve her symptoms does not in itself speak to whether her condition is ultimately permanent. PT Pomeroy has specifically opined that her condition will be permanent even if she pursues that recommended treatment.

### c. Comparison to cited cases

The three prior cases cited by petitioner are all interrelated insofar as they have been benchmarked against one another. *Schoonover* was decided first. In that case, former Chief Special Master Dorsey explained that the petitioner suffered "severe" pain for a year after her vaccination, then still experienced constant pain rated 3/10 post-surgically even while on narcotic medication. *Schoonover v. Sec'y of Health & Human Servs.*, No. 16-1324V, 2020 WL 5351341, at *4 (Fed. Cl. Spec. Mstr. Aug. 5, 2020). Two years post-vaccination and after two surgeries petitioner still had "marked" limitations in range of motion and "significant" pain with a guarded prognosis. *Id*. She was awarded $200,000.00 in actual pain and suffering. *Id*. Additionally, because she demonstrated by medical opinion that she had a permanent 40% partial disability, she was awarded future pain and suffering of $1,200.00 per year. *Id*. at *6.

Subsequently Chief Special Master Corcoran decided *Lawson* in part based on comparison to *Schoonover*. He found that petitioner had suffered "an unprecedented three surgeries, seven steroid injections, four rounds of PT, six MRIs, and most recently started PRP injections." *Lawson v. Sec'y of Health & Human Servs.*, No. 18-882V, 2021 WL 688560, at *5 (Fed. Cl. Spec. Mstr. Jan. 5, 2021). He further noted that the *Lawson* petitioner was fired from her job due to her SIRVA and that she lives with a constant ache rated at 2/10 and still has significant limitations regarding exercise and arm stretching. Nonetheless, he also noted that her pain at times appeared to be intermittent and that it was unclear whether all of her later shoulder complaints were sequala to her SIRVA. *Id*. at *5-6. The *Lawson* petitioner was awarded slightly more in actual pain and suffering than *Schoonover* ($205,000.00 rather than $200,000.00) but did not receive any award for projected pain and suffering. *Id*. at *6. The overall course of the *Lawson* petitioner's course was about four years.

Thereafter, the Chief Special Master compared *Elmakky* to both *Schoonover* and *Lawson* and found the *Elmakky* petitioner's pain and suffering to be comparable to that of *Lawson* and awarded the exact same amount ($205,000.00). The *Elmakky* petitioner "suffered severe pain levels and limited range of motion ('ROM') which failed to abate during the year after vaccination, despite receiving a cortisone injection, taking prescription pain medication, attending 21 sessions of physical therapy ('PT'), and undergoing surgery which consisted of manipulation under general anesthesia and a bursal aspiration." *Elmakky v. Sec'y of Health & Human Servs.*, No. 17-2032V, 2021 WL 6285619, at *5 (Fed. Cl. Spec. Mstr. Dec. 3, 2021). Petitioner continued to experience high levels of pain after her first surgery. *Id*. at n. 13. Her second surgery

provided temporary relief. Thereafter her records document continued reports of "more moderate" pain. *Id*. at *6. The third surgery then provided significant relief. *Id*. The overall course of the condition appears to have been about 38 months (from November of 2016 to January of 2020), with about one year of severe pain, less than a year of temporary relief, and then a further year of moderate pain. *Id*.

In contrast, respondent cites the prior *Pruitt* decision by Special Master Sanders in which she awarded $185,000.00 in compensation for past pain and suffering. *Pruitt v. Sec'y of Health & Human Servs*., No. 17-757V, 2021 WL 5292022, at *10 (Fed. Cl. Spec. Mstr. ct. 29, 2021). *Pruitt* does not contain any comparison to the three above-discussed cases. The *Pruitt* petitioner underwent three cortisone injections, two surgeries, and fourteen physical therapy sessions, over the course of four years. *Id.* at *8. Significantly, however, Special Master Sanders did not conclude that the *Pruitt* petitioner's additional surgery necessarily rendered her case more severe than some petitioners that underwent only a single surgery given the nature of her complaints overall, limited need for physical therapy, and ultimate lack of disability. *Id*. There was also a 14-month gap in the treatment history, but this was discounted due to a lapse in health insurance. *Id*. Petitioner's overall time from vaccination to maximum medical improvement was about four years. *Id.*

Finally, I also note my own prior decision in *Lang v. Sec'y of Health & Human Servs*., No. 17-995V, 2022 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2022). In that case, I engaged in comparison of the petitioner's history against *Schoonover*, *Lawson*, and *Elmakky*, as well as several other cases. The *Lang* petitioner had two surgeries like the *Schoonover* petitioner; however, the *Schoonover* petitioner had more severe pain and the injury had a more demonstrable effect on her daily life. *Id*. at *11-12. Regarding the *Lang* petitioner, I noted that "it is the persistence rather than the severity of petitioner's pain that stands out. The severity of petitioner's shoulder pain seems to be best characterized as relatively moderate for a SIRVA." *Id*. at *10. Nonetheless, the evidence in that case indicated that petitioner's pain management specialist felt she had a poor prognosis for any full resolution of her pain, though her residual sequela was not severe. *Id*. at *12. I awarded the *Lang* petitioner $195,000.00 in actual pain and suffering and $400 per year for future pain and suffering. *Id*. at *12-13. The time from the *Lang* petitioner's vaccination to her second surgery was approximately 15 months. *Id*. at *1-3. The second surgery provided some relief, but she still had discomfort and reduced range of motion thereafter. *Id*. at *3. By the time her providers concluded she had no further options, petitioner had suffered her condition for about four and a half years. *Id*. at *4. The *Lang* petitioner had a three-month delay in initially seeking treatment, but did not otherwise have any significant gaps in her treatment history. *Id*. at *10.

The instant petitioner's pattern of treatment is particularly difficult to compare to prior petitioners. However, especially in light of my own prior decision in *Lang*, I am persuaded by respondent's argument that this petitioner's medical history warrants an award of actual pain and suffering lower than that of *Schoonover*, *Lawson* and *Elmakky* given her gaps in treatment history. But I am not persuaded by respondent's further argument that the damages in this case are even lower than *Pruitt* given the longer

14

overall duration of symptoms, more extensive pursuit of physical therapy, and the additional surgery in this case.  Although petitioner has demonstrated she should receive an additional award of future pain and suffering, her degree of disability as documented in her August 9, 2022 physical therapy record is less severe than the 40% permanent disability documented in *Schoonover* after accounting for the fact that PT Pomeroy indicates petitioner has a "good" potential to achieve "tolerable" symptoms with additional therapy.

### VI.     Conclusion

In light of all of the above, I award petitioner $190,000.00 in compensation for actual pain and suffering.  I further award compensation for projected pain and suffering in the amount of $800 per year for 35 years.  No claim for lost earnings was asserted.  The parties agree she should be awarded $3,799.75 for unreimbursable expenses.

**Accordingly, petitioner shall file a joint status report on behalf of the parties, by no later than <u>Monday, June 26, 2023</u>, confirming an agreed upon amount reflecting the net present value of petitioner's award for projected pain and suffering.**

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master